**UNITED STATES of America**

v.

**Albert John LUISA**

**No. CR.3:02CR254, CR. 3:02CR257.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

June 9, 2003.

Lyle J. Yurko, Attorney at Law, Charlotte, NC, for Defendant.

Kenneth M. Smith, U.S. Attorney's Office, Charlotte, NC, for U.S.

*MEMORANDUM AND ORDER*

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the Government's Notice of Appeal and Motion for Revocation of the Order of Magistrate Judge Carl Horn entered orally on May 23, 2003, which provided for the release of the Defendant with certain conditions. For the reasons stated herein, the Government's motion is granted and the Defendant is ordered detained pending sentencing.

## I. PROCEDURAL HISTORY

On December 2, 2003, the Defendant was charged in a 16–count bill of indictment in Case No. 3:02cr254 with numerous violations of federal law, including conspiracy, Racketeer Influenced and Corrupt Organizations (RICO) violations, illegal gambling, and Hobbs Act violations. On that same date, Defendant was charged in a 41–count bill of indictment in Case No. 3:02cr257 with conspiracy, RICO violations, sale and/or receipt of stolen goods, trafficking in contraband cigarettes, Hobbs Act violations, illegal firearms transactions, transferring a firearm for use to commit a crime of violence, and murder for hire. Defendant was, during the time alleged in both indictments, a deputy sheriff with the Mecklenburg County Sheriff's Department, and was alleged to have used that position in furtherance of these crimes.

On December 10, 2002, Magistrate Judge Horn ordered Defendant detained pending trial or other resolution of his case. The Magistrate Judge noted at that time that the "Defendant is charged with 42 felony offenses in two indictments, one of which involves the sale of a handgun to commit a murder, as well as racketeering, sale of firearms to convicted criminals and extortion." Order of Defendant Pending Trial, filed December 10, 2002. A videotape played during that hearing recorded the Defendant's meeting with an undercover agent who had requested the Defendant to find a gun which could not be traced for use in killing someone "up north." Transcript of Detention Hearing conducted on December 10, 2002, *attached to* Government's Memorandum in Support of Appeal of Release Order["Government's Memorandum"], filed June 2, 2003, at 10. During the incident, which occurred on September 30, 2002, the Defendant laughed about how certain caliber bullets would

"bounce around" inside a person's brain. *Id.*, at 21. He told another undercover agent that if he got into trouble, the authorities would have to find him. *Id.*, at 13–14. At that time, the Magistrate Judge noted:

> I've heard enough. I am going to detain Mr. Luisa.... He's charged with 42 felony offenses including racketeering, giving a gun or selling a gun to someone who he believed was going to ... use[ ][it] to kill another person, with extortion.... [T]he FBI was not involved in the $30,000–year extortion scheme he had going with another racketeering organization here in Charlotte with which he is charged now as a codefendant. *The scope and range of his criminal conduct is breathtaking, and I think he's a danger to the community and he presents a risk of flight and I will not release him today and I will not, under any circumstances, release him if it's up to me in the future.*

*Id.*, at 24 (emphasis added).

On February 12, 2003, the Defendant entered into a plea agreement with the Government pursuant to which he pled guilty to various charges of both indictments, as noted herein.

**Case No. 3:02cr254:**

| Count: | Statute: | Charge: |
| --- | --- | --- |
| 1 | 18 U.S.C. § 1962(c) | Racketeering: "To protect the operation of the illegal gambling business, the Kakavitsas Family Enterprise paid LUISA, a sworn law enforcement officer, approximately thirty thousand dollars ($30,000), per year in bribe payments to protect the Basement gambling operation, prevent detection by other law enforcement officers, and allow the unhindered operation of the illegal gambling business.... While employed as a deputy sheriff with the Mecklenburg County Sheriff's Department, LUISA did and attempted to protect and maintain the illegal gambling business through various means, including but not limited to obtaining information regarding investigations into the Basement, informing the Kakavitsas Family about what he learned; accessing law enforcement computers to gather information about possible investigations into the Basement; and standing guard during gambling hours to enforce the directions of the Kakavitsas Family." **Bill of Indictment, at 3.** |
| 2 | 18 U.S.C. § 1962(d) | Conspiracy to violate RICO |
| 4 | 18 U.S.C. § 371 | Conspiracy to violate federal law |
| 5 | 18 U.S.C. § 1955 | Illegal gambling |
| 6 | 18 U.S.C. § 1511 | Interference with gambling laws |
| 7 | 18 U.S.C. § 1951 | Hobbs Act violations |

Plea Agreement, filed February 12, 2003, at 1.
Case No. 3:02cr257:

| Count: | Statute: | Charge: |
|---|---|---|
| 1 | 18 U.S.C. § 1962(c) | Racketeering: "[T]he Luisa Crew [was] a criminal organization whose members and associates engaged in acts of interstate transportation of stolen property; sale, receipt and possession of stolen property; sale of firearms and ammunition to a convicted felon; sale of firearms and ammunition to a resident of another state; trafficking in contraband cigarettes; bribery; extortion; and money laundering. . . . LUISA, a deputy sheriff with the Mecklenburg County Sheriff's Department, was the leader of the enterprise and directed other members of the enterprise in carrying out unlawful and other activities in furtherance of the conduct of the enterprise's affairs. . . . LUISA . . . us[ed] his position as a deputy sheriff to protect shipments of stolen goods and contraband cigarettes . . . ." **Bill of Indictment, filed December 2, 2002, at 1–2.** |
| 2 | 18 U.S.C. § 1962(d) | Conspiracy to violate RICO |
| 3 | 18 U.S.C. § 371 | Conspiracy to violate federal laws: "On or about June 20, 2002, LUISA, BUNTING and WILLIAMS 'protected' the deal for 81 master cases of stolen cigarettes. . . . LUISA, in the presence of WILLIAMS, BUNTING and the UCAs [undercover agents] states that they know where to find CHUN[, a co-conspirator,] and they can 'take him out' if necessary." *Id.*, at 14. |
| 4 & 5 | 18 U.S.C. § 2315 | Sale and receipt of stolen goods |
| 8, 11, 14 & 17 | 18 U.S.C. § 2342 | Trafficking in contraband cigarettes |
| 9, 12 & 15 | 18 U.S.C. § 1951 | Hobbs Act violations |
| 10, 13 & 16 | 18 U.S.C. § 1951 | Hobbs Act conspiracy |
| 18, 19, 23, 24 & 25 | 18 U.S.C. § 922(d) | Sale of a firearm to a convicted felon |
| 26 | 18 U.S.C. § 922(d) | Sale of ammunition to a convicted felon |
| 27, 28 & 31 | 18 U.S.C. § 922(a)(5) | Sale of a firearm to a nonresident |
| 32 | 18 U.S.C. § 924(h) | Transferring a firearm for use to commit a crime of violence |
| 34–41 | 18 U.S.C. § 1956 | Promotion of money laundering |

Plea Agreement, *supra.*

In the plea agreement, Defendant "admit[ted] to being in fact guilty as charged in those Counts." *Id.*, at 1. In exchange for his pleas of guilty to 39 felony charges, the Government agreed to dismiss, among other charges, a charge of murder for hire "at the appropriate time," *i.e.*, at sentenc-

ing. *Id.* The agreement also contained the following language:

> The defendant agrees that a duly-qualified federal Magistrate Judge may conduct the hearing required by Fed. R.Crim.P. 11. With the Court's permission, the factual basis, as required by Fed.R.Crim.P. 11(f), will be deferred until the time of sentencing. *The defendant stipulates that there is a factual basis for the plea of guilty* and that the Court may use the offense conduct set out in the Pre–Sentence Report, except any facts to which the defendant has objected, to establish a factual basis for the defendant's plea.

*Id.,* at 13 (emphasis added).

On March 6, 2003, Defendant and his attorney attended a Rule 11 hearing before the Magistrate Judge and, as is the custom in this District, signed the pleading captioned "Entry and Acceptance of Guilty Plea (Rule 11 Proceeding)." Entry and Acceptance of Guilty Plea (Rule 11 Proceeding), filed March 6, 2003, at 4. The Defendant's signature appears underneath the following language:

> ON ADVICE AND IN THE PRESENCE OF COUNSEL, THE DEFENDANT CONSENTS TO THE ACCEPTANCE OF HIS[ ] GUILTY PLEA BY A MAGISTRATE JUDGE. BY SIGNING BELOW, THE DEFENDANT (AND COUNSEL) AFFIRM THAT THE ANSWERS GIVEN DURING THIS PROCEEDING ARE TRUE AND COMPLETE TO THE BEST OF THEIR KNOWLEDGE.

*Id.* The signatures of both the Defendant and his attorney follow. The pleading then provides:

> Based on the representations and answers given by the defendant (and counsel) in this proceeding, the Court finds that the defendant's plea is knowingly and voluntarily made; and that the de-

fendant understands the charges, potential penalties, and consequences of his [ ] plea. *Accordingly, the defendant's plea is hereby accepted.*

*Id.* (emphasis added). The signature of the Magistrate Judge appears below this provision.

The record does not reflect that the Defendant thereafter moved to reconsider the issue of release on bond. However, a hearing was conducted on May 23, 2003, at which time the Magistrate Judge concluded (1) that the Defendant was not yet convicted of any crime; (2) as a result, the standard to be applied was whether there had been a change in circumstances sufficient to satisfy the Court that the Defendant was no longer a danger to the community or a risk of flight; and (3) "I've heard from at least one law enforcement officer how much they consider it valuable what [the Defendant] has done [to cooperate] but whether that's enough to overcome the image in my mind of him telling someone how to blow someone's brains out with a gun he was selling is the question." Transcript of May 23, 2003, Hearing, *attached to* Government's Memorandum, at 2–3.

During the bond hearing, defense counsel argued that there had been "enormous changes in the circumstances" stemming from the 20–page proffer coming after a two-day period of debriefing. *Id.,* at 3. Defendant, counsel argued, would not jeopardize the possibility of a downward departure by violating any terms of release which might be granted. *Id.,* at 3–4. And, finally, counsel argued that the most compelling reason for release was the more favorable classification which the Bureau of Prisons would give the Defendant as a prisoner who was allowed to self-report to prison. *Id.,* at 5. The Magistrate Judge concluded:

I did make some very strong statements at the detention hearing and I was repulsed by the charges against Mr. Luisa, particularly the graphic videotape of him telling someone how—what kind of ammunition to put in a gun to devastate and destroy someone's brain and kill them. But I also think that there has been a significant change in circumstances. I was unaware of the fine quality of his family. I kn[e]w they had supported him but I didn't know about his dad's Marine background, hadn't heard him speak. I was not aware that drinking and gambling addiction had preceded the worst of the criminal conduct which he's now pled guilty to and could be a factor which would be no longer present. I'm not taking the position that a guilty plea is a change of circumstances, but the benefits that he has gleaned from his representation by Mr. Yurko, the Plea Agreement, the proffer, the likelihood of a downward departure if he doesn't mess up certainly reduces the exposure tremendously that he would face if he were to do something stupid if I were to release him.

*Id.*, at 13. The Magistrate Judge then ordered that the Defendant be released on a $100,000 bond to the custody of his father and placed on 24–hour electronic monitoring with house arrest. Order Setting Conditions of Release, filed May 23, 2003. This appeal followed.

## II. STANDARD OF REVIEW

■ "When the district court acts on a motion to revoke or amend a magistrate judge's pretrial [release] order, the district court acts *de novo* and must make an independent determination of the proper pretrial detention or conditions of release."

*United States v. Stewart,* 19 Fed.Appx. 46, 48 (4th Cir.2001) (citing *United States v. Rueben,* 974 F.2d 580, 585–86 (5th Cir. 1992)).

## III. DISCUSSION

At the hearing before this Court, defense counsel argued that the Defendant has not yet been "found guilty" and, as a result, the provisions of 18 U.S.C. § 3143(a) do not apply. Entering a plea of guilty before a United States Magistrate Judge, counsel argued, is not a final determination of guilt because it is merely a recommendation that the District Court accept the finding of guilt. And, the United States Attorney has frequently ignored the provisions of § 3143 by allowing defendants to self-report to prison, thus resulting in the principle of "desuetude." [1] The Government argues that because the Defendant has pled guilty to a crime of violence, the statute presumes he must be detained unless he can show (1) there is a substantial likelihood that he will prevail on a motion for a new trial or judgment for acquittal, and (2) he shows by clear and convincing evidence that he is not a flight risk or a danger to the community.

■ Neither the Government nor the Defendant has addressed 18 U.S.C. § 3145 which is the governing statute when review of an order of release is conducted by a different judicial officer. *United States v. Cisneros,* 328 F.3d 610, 614–15 (10th Cir.2003) ("Revocation of a prior release order under § 3142(f) is available only when the review of a detention or release order is being conducted by the same judicial officer who entered the order and when new, material information is available."). Where review of an order of release entered by a Magistrate Judge is

---

1. In other words, the policy of allowing federal defendants to self-report has made the mandatory provision of the statute meaningless by virtue of abandonment.

sought, that review must be done by the Court having original jurisdiction of the offense pursuant to § 3145 which "does not require that new information be available before a release ... order can be reconsidered and revoked." *Id.*, at 614; *accord, United States v. El Edwy*, 272 F.3d 149 (2nd Cir.2001); *Stewart, supra; United States v. Mostrom*, 11 F.3d 93, 95 (8th Cir.1993); *United States v. Carr*, 947 F.2d 1239, 1240 (5th Cir.1991); *United States v. Koon*, 6 F.3d 561, 562 n. 1 (9th Cir.1993) (Rymer, J., concurring in denial of *en banc* review); *United States v. Clark*, 2003 WL 60478 (W.D.Va.2003).

■ Section 3145 provides in pertinent part that "[a] person subject to detention pursuant to section 3143(a)(2) ... and who meets the conditions of release set forth in section 3143(a)(1) ... may be ordered released, under appropriate conditions, by the judicial officer, if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate." 18 U.S.C. § 3145(c). That is, a person who has been *"found guilty "* of a crime of violence and who is *"awaiting the imposition of sentence,"* and who further is able to establish by "clear and convincing evidence" that he is not a flight risk or a danger to the community, may be released on a clear showing of "exceptional reasons" why detention is not appropriate. *United States v. Kinslow*, 105 F.3d 555 (10th Cir.1997) (To qualify for the exceptional reasons exception, a defendant does not have to show, in addition, the likelihood of acquittal or a new trial or that the Government has not requested imprisonment.).

■ Contrary to the argument of defense counsel and the conclusion of the Magistrate Judge, the use within § 3143(a)(2) of the phrases "a person who has been found guilty" and who "is awaiting imposition" of sentence clearly includes a defendant who has entered a guilty plea but who has not yet been sentenced. Otherwise, the language of the statute would be meaningless. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) ("As in all statutory construction cases, we begin with the language of the statute. The first step 'is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.' The inquiry ceases 'if the statutory language is unambiguous and the statutory scheme is coherent and consistent.'" (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997))). The plain language of the subsection does not invite counsel's tortured comparison to Rules 31, 32 and 11. *Clark, supra* (applying the statute to a defendant who pled guilty and then sought review of an order of detention pending sentencing); *accord, United States v. Bowman*, 98 F.3d 1343 (table), 1996 WL 571135 (6th Cir. 1996) ("Release is no longer favored once guilt of a crime has been established."); *United States v. Green*, 250 F.Supp.2d 1145 (E.D.Mo.2003) (Defendant taken into custody immediately upon entry of guilty plea); *United States v. Vallie*, 2001 WL 627432, at *2 (D.N.D.2001) ("In fact, after a guilty plea or conviction of one of the enumerated crimes, there is a strong presumption of mandatory detention, subject only to a very limited exception." (citing *United States v. Rodriguez*, 50 F.Supp.2d 717, 719 (N.D.Oh.1999))); *United States v. Burnett*, 76 F.Supp.2d 846 (E.D.Tenn. 1999). Defendant's citation to *United States v. Norfleet*, 185 F.Supp.2d 315 (S.D.N.Y.2002), is to no avail. That case involved the review of an order of release by the same magistrate judge who had earlier entered the order. Moreover, the Fourth Circuit has clearly established that once a guilty plea is entered, even before a

magistrate judge, a defendant must present exceptional reasons to support its withdrawal. "Given that [Defendant] consented to have the magistrate judge preside over his Rule 11 and tendered his plea at that time, the magistrate judge's recommendation to accept his plea is binding." *United States v. Breedlove,* 7 Fed.Appx. 268, 269 (4th Cir.2001) ("Were withdrawal automatic in every case where the defendant decided to alter his tactics and present his theory of the case to the jury, the guilty plea would become a mere gesture, a temporary and meaningless formality reversible at the defendant's whim." (quoting *United States v. Hyde,* 520 U.S. 670, 677, 117 S.Ct. 1630, 137 L.Ed.2d 935 (1997))); *accord, United States v. Graham,* 48 Fed. Appx. 458 (4th Cir.2002) (Although the plea entered before the magistrate judge had not yet been accepted by the district court, during the Rule 11 hearing the defendant clearly waived his right to have the plea taken by the district court. As a result, his motion to withdraw the plea was denied.).

Counsel's stated reasons justifying release of the Defendant at this time are his cooperation, as outlined in his 20–page proffer, the unlikelihood that he would jeopardize a motion for a downward departure, and the fact that being allowed to self-report to prison would qualify him for detention in a camp-type setting. The Magistrate Judge concluded that the quality of the Defendant's family, the fact that his father had served in the United States Marines, the Defendant's addiction,[2] and the possibility of a downward departure motion constituted changed circumstances sufficient to warrant release. None of these grounds are exceptional, nor would they be considered by the undersigned as a change of circumstances, assuming *arguendo* that defense counsel's arguments are correct.[3]

The statute does not define the parameters of an "exceptional reason." While courts appear to agree that circumstances must be "out of the ordinary," "uncommon," or "rare," "[n]o opinion has even begun definitively to identify the factors a court must consider in deciding the exceptional reasons issue." In each case, "the determination of whether 'exceptional reasons' have been clearly shown is quintessentially a fact-intensive inquiry requiring a case by case analysis." It is clear that mere personal reasons, including caring for a family or gainful employment, are not "exceptional."... This Court additionally concludes that Congress did not intend release upon a simple accumulation of numerous common circumstances that alone would not constitute an exceptional reason.

*Green,* 250 F.Supp.2d at 1149 (quoting *Koon,* 6 F.3d at 564–65) (other citations omitted). Thus, the quality of the Defendant's family will not suffice as an exceptional reason. Nor does the "package of restrictions" to which he is willing to submit qualify as such a reason. *Borodin v.*

---

**2.** The Defendant's prior addiction to alcohol and gambling actually militates against release since he could be tempted to return to his old lifestyle.

**3.** Although not clearly stated, it appears that counsel believes the provision of 18 U.S.C. § 3142(f) is the appropriate one to be applied. However, that provision applies when an order of detention is "reopened" before the same judicial officer who made the initial determination. Under that standard, the officer would consider information not known at the time of the first hearing which has a material bearing on the issue of whether there are conditions which assure the defendant's appearance and the safety of the public. For all the reasons stated herein, the undersigned would deny release under 18 U.S.C. § 3142 as well.

*Ashcroft,* 136 F.Supp.2d 125, 128, 131 (E.D.N.Y.2001). The Court would be hard-pressed to find any defendant who would not submit to a variety of conditions provided that he or she was released.

The fact that the Defendant, as a former police officer, will encounter danger in prison is a condition which is not ordinarily experienced by individuals facing incarceration. *Green,* 250 F.Supp.2d at 1150. However, there has been no showing that the Bureau of Prisons (BOP) will ignore this condition in determining the appropriate facility of confinement. Defendant has argued that being allowed to self-report will enhance the possibility of being incarcerated at a facility such as the detention camp at Seymour Johnson Air Force Base in Goldsboro, North Carolina. That is not the same as showing that BOP will inevitably place him in a dangerous custodial setting. *Borodin, supra.*

Defendant also argues that his extensive cooperation will most certainly result in a motion pursuant to U.S.S.G. § 5K1.1; thus, he would not jeopardize such a motion by failing to abide by conditions of release. However, it is not alleged that such a motion would be likely to result in no prison time. *See, e.g., United States v. Cook,* 42 Fed.Appx. 803 (6th Cir.2002) (cooperation with the government did not amount to an exceptional circumstance); *United States v. Douglas,* 824 F.Supp. 98, 99 (N.D.Tex.1993). None of the reasons given by the Defendant or the Magistrate Judge amount to a "unique combination of circumstances giving rise to situations that are out of the ordinary." *United States v. DiSomma,* 951 F.2d 494, 497 (2nd Cir. 1991).

Assuming *arguendo* that § 3143(a)(2) applies, the Defendant has made no argument that there is a substantial likelihood that a motion for acquittal or new trial will be granted. Indeed, the terms of his plea agreement would dictate against such motions. Assuming *arguendo* that the provisions of § 3142 apply, the undersigned would make the following specific findings:

1. the offenses to which the Defendant has pled guilty are serious crimes which subject the Defendant to a significant amount of prison time;

2. the Defendant has pled guilty to these serious crimes and has waived his right to direct appeal or collateral attack, except on the grounds of prosecutorial misconduct or ineffective assistance of counsel, neither of which ground is likely;

3. the Defendant's background in the Fugitive Task Force means that he is clearly versed in the means and methods of fugitives, should he determine that the amount of time faced in prison is unbearable;

4. the Defendant's past conduct from 1998 through the date of his arrest eradicates his prior good record as a police officer; indeed, many of the items disclosed in his proffer mitigate against release under any conditions; [4]

5. the Defendant has told undercover agents in the past that he would flee rather than face prison;

6. the Defendant's comments regarding murder for hire have not been disputed; and

---

**4.** For example, his admissions that after being rotated out of the fugitive unit, he immersed himself in drink and gambling and harbored ill feelings toward the Sheriff's Department

show a likelihood of recidivism. Exhibit B, Proffer, *attached to* Reply to Government's Opposition of Defendant's Release Pending Sentencing, filed June 1, 2003.

7. the Defendant admits to having solicited other officers who joined the conspiracies at issue.

### IV. ORDER

**IT IS, THEREFORE, ORDERED** that the Government's motion to revoke the Magistrate Judge's order of release is hereby **GRANTED**, and the Defendant shall remain in detention pending sentencing.